IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:16-CT-3290-FL

| | | |
|---|---|---|
| JOSEPH LEE PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANK L. PERRY, W. DAVID GUICE, | ) | ORDER |
| GEORGE SOLOMON, KENNETH | ) | |
| LASSITER, CARLTON JOYNER, PAUL | ) | |
| G. BUTLER, JR., WILLIS J. FOWLER, | ) | |
| JAMES L. FORTE, and DANNY G. | ) | |
| MOODY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the parties' cross motions for summary judgment (DE 41, 63), filed pursuant to Federal Rule of Civil Procedure 56. The motions have been fully briefed and the issues raised are ripe for ruling. For the reasons stated below, defendants' motion is granted, plaintiff's motion is denied, and plaintiff's claims are dismissed.

**STATEMENT OF THE CASE**

On October 28, 2016, plaintiff, a state inmate proceeding pro se, filed the instant civil rights action pursuant to 42 U.S.C. § 1983, alleging defendants violated his constitutional rights by changing his parole reviews from annually to once every three years, and by refusing to award good-time credits toward his unconditional release date. As relief, plaintiff seeks compensatory and punitive damages, injunctive relief, and a declaratory judgment.

On November 8, 2016, plaintiff filed motion to amend the complaint. On February 21, 2017, plaintiff filed motion to appoint counsel. The court conducted its frivolity review of the complaint

and proposed amendments on May 17, 2017, and allowed the matter to proceed. The court also granted plaintiff's motion to amend and denied plaintiff's motion to appoint counsel in the frivolity order.[1]

On October 27, 2017, the court entered case management order governing discovery and dispositive motions practice. On December 6, 2017, plaintiff filed second motion to amend the complaint, which the court subsequently granted. After granting several requests for extension of time, the court set July 3, 2018, deadline for close of discovery, and August 17, 2018, deadline for dispositive motions.

On March, 8, 2018, before close of discovery, plaintiff filed the instant motion for partial summary judgment. Plaintiff argues the record evidence establishes defendants violated his constitutional rights by refusing to apply his good-time credits toward his unconditional release date, and by increasing the interval between his parole reviews. Plaintiff relies upon a memorandum of law, statement of material facts, and appendix comprised of numerous exhibits, including plaintiff's parole review records, correspondence between plaintiff and various North Carolina Department of Public Safety ("DPS") officials, correspondence between plaintiff's sentencing judge and the North Carolina Parole Commissioner, and DPS records calculating plaintiff's good-time credits.

After receiving extension of time, defendants filed response in opposition to the motion on July 20, 2018, supported by statement material facts, memorandum of law, and appendix including affidavit of non-party Mary Stevens and exhibits attached thereto, DPS's good-time credits policy, Parole Commission operations manual, March 2, 1993, correspondence between Charles Cromer and plaintiff's sentencing judge, and defendant Guice's official job description.

---

[1] Plaintiff has since filed, and the court has denied, two motions to appoint counsel. (See DE 47, 74 (orders denying motions to appoint counsel)).

On August 17, 2018, defendants filed the instant motion for summary judgment, arguing the record evidence establishes defendants did not violate plaintiff's clearly-established rights. Defendants rely upon a memorandum of law and statement of material facts, and they incorporate by reference their appendix filed in response to plaintiff's motion for summary judgment. Plaintiff filed response in opposition on October 11, 2018, relying upon a memorandum of law, statement of material fact, and additional appendix including various North Carolina General Statutes, DPS policies concerning good-time credits, plaintiff's resumes and other internal prison records, plaintiff's judgment and commitment orders for murder and armed robbery convictions, plaintiff's parole review records, and plaintiff's February 5, 2011, grievance.

**STATEMENT OF FACTS**

The undisputed facts and pertinent related litigation background to plaintiff's claims can be summarized as follows. Between February 1970 and November 1976, plaintiff was convicted of eight different criminal offenses, which included two counts of attempted armed robbery, two counts of armed robbery, one count of assault with a deadly weapon with intent to kill inflicting serious bodily injury, and one count of first-degree murder. (Stevens Aff. (DE 58-1) ¶ 4). As relevant here, the state court ordered plaintiff's life sentence for armed robbery to run consecutive to a previously-imposed 20-year sentence for assault with a deadly weapon with intent to kill. (Id.). In a separate case, the state court ordered plaintiff to serve his life sentence for first-degree murder concurrently with a previously-imposed 50-year sentence for attempted armed robbery. (Id.).

Pursuant to N.C. Gen. Stat. § 14-2 (1974) (since repealed), plaintiff's life sentences were

3

"considered as a sentence of imprisonment for a term of 80 years in the State's prison."[2] DPS prohibits plaintiff from earning good-time credits toward his unconditional release date because DPS interprets plaintiff's sentence as a life term for purposes of its good-time credit policy regardless of application of N.C. Gen. Stat. § 14-2 (1974). (See Stevens Aff. (DE 58-1) ¶ 28).

A. State v. Bowden

Plaintiff's claims in the instant action challenging this DPS policy have been considered and rejected by the North Carolina Supreme Court. DPS has always "interpreted a life sentence imposed under [N.C. Gen. Stat. § 14-2 (1974)] to be an indeterminate sentence that would expire only upon an inmate's death." Jones v. Keller, 364 N.C. 249, 252 (2010).[3] For inmates sentenced to life terms, including those sentenced under N.C. Gen. Stat. § 14-2 (1974), DPS therefore applied good-time credits "solely for the purposes of allowing [the inmate] to move to the least restrictive custody grade and to calculate [the inmate's] parole eligibility date, and not for the purpose of allowing [such inmates] unconditional release." Id. at 254.

In 2005, Bobby Bowden file a state habeas petition challenging the DPS policy of refusing to award good-time credits toward unconditional release dates for inmates sentenced to life terms under N.C. Gen. Stat. § 14-2 (1974). State v. Bowden, 193 N.C. App. 587, 598 (2008). The North Carolina Court of Appeals held that a life sentence under N.C. Gen. Stat. § 14-2 (1974) "is

---

[2]N.C. Gen. Stat. § 14-2 (1974), in effect between April 8, 1974, and June 30, 1978, provided:

Every person who shall be convicted of any felony for which no specific punishment is prescribed by statute shall be punished by fine, by imprisonment for a term not exceeding 10 years, or by both, in the discretion of the court. A sentence of life imprisonment shall be considered as a sentence for a term of 80 years in the State's prison.

N.C. Gen. Stat. § 14-2 (1974).

[3]DPS previously was known as the Department of Corrections, and thus references to "DOC" in the Jones and Bowden decisions are synonymous with references to DPS in this order.

considered as an 80-year sentence for all purposes" and that DPS therefore must award good-time credits as if Bowden had received an 80-year sentence instead of life imprisonment. Id. at 601. Such ruling had the effect of permitting Bowden and other inmates sentenced to life terms under N.C. Gen. Stat. § 14-2 (1974) ("Bowden group"), including plaintiff, to apply earned good-time credits toward their unconditional release dates. See id. The North Carolina Supreme Court initially granted discretionary review in Bowden, but later determined discretionary review had been improvidently granted. State v. Bowden, 363 N.C. 621, 621 (2009).[4]

Following the 2008 Bowden decision, DPS Secretary Alvin Keller notified the Bowden group inmates that DPS would not apply good-time credits toward their unconditional release date (calculated using the 80-year term) pending further litigation. See Baggett v. Keller, 796 F. Supp. 2d 718, 724 (E.D.N.C. 2011). In November 2009, Alford Jones, another member of the Bowden group, initiated litigation challenging Secretary Keller's decision. Id. Relying on the North Carolina Court of Appeals decision in Bowden, the state trial court granted relief and ordered Jones's immediate release. Id. The North Carolina Supreme Court granted DPS's motion for temporary stay of Jones's release and its petition for certiorari. Id.

The North Carolina Supreme Court issued its decision in Jones on August 27, 2010. 364 N.C. at 249. The plurality opinion[5] held that DPS acted within its statutory authority under North Carolina law "to determine the purposes for which [good-time credits are] awarded." Id. at 255-56. With respect to Jones's federal due process challenge, the plurality found Jones's "liberty interest,

---

[4]As a result of the Bowden decision, DPS informed some Bowden group inmates they should prepare for imminent release. Baggett v. Keller, 796 F. Supp. 2d 718, 724 (E.D.N.C. 2011). The potential release of numerous inmates convicted of first-degree murder and sentenced to life imprisonment also caused "great public outcry." Id.

[5]Justice Edmunds wrote the plurality opinion, in which Chief Justice Parker and Justice Martin joined. Justice Newby and Justice Brady concurred in the result.

if any, in having [sentence] credits used for the purpose of calculating his date of unconditional release is de minimis, particularly when contrasted with the State's compelling interest in keeping inmates incarcerated until they can be released with safety to themselves and to the public." Id. at 257. The plurality therefore concluded that Jones "has no State-created right to have his time credits used to calculate his eligibility for unconditional release." Id. The plurality also emphasized that "[n]o regulation explicitly provides that credits are to be used to calculate an unconditional release date, and [DPS] asserts that it never considered that these regulations applied to Jones or other inmates similarly situated for purposes of calculating an unconditional release date." Id. at 258. Therefore, "[i]n light of the compelling State interest in maintaining public safety, . . . [DPS] regulations do not require that [DPS] apply time credits for purposes of unconditional release to those who committed first-degree murder during the 8 April 1974 through 30 June 1978 time frame and were sentenced to life imprisonment." Id.

As to Jones's ex post facto challenge, the plurality held that Jones could not establish a violation where "Jones does not allege that any legislation or regulation has altered the award of good-time credits [or that DPS] changed its interpretation of its applicable regulations." Id. at 259.[6]

B.  Parole Determinations

Plaintiff also suggests in his claims a challenge to the North Carolina General Assembly's decision to increase his parole review intervals from annually to once every three years. Plaintiff became parole eligible in January 2002. (Stevens Aff. (DE 58-1) ¶¶ 7-8). At the time of plaintiff's

---

[6] As set forth in analysis herein, here, plaintiff's good-time credits claims are identical to the federal constitutional claims resolved in the Jones decision. Plaintiff alleges Jones was wrongly decided and requests a court order directing DPS to apply his good-time credits to his unconditional release date.

convictions, N.C. Gen. Stat. § 15A-1371(b) (repealed)[7] provided that inmates eligible for parole would receive annual parole reviews. (Id. ¶ 10). Between 1999 and 2008, plaintiff received annual parole reviews. (Id. ¶ 16). In 2008, the North Carolina General Assembly amended the (repealed) version of § 15A-1371(b) applicable to plaintiff as follows:

> The Commission shall review cases where the prisoner was convicted of first or second degree murder, and in its discretion, give consideration of parole and written notice of its decision once every third year; except that the Commission may give more frequent parole consideration if it finds that exigent circumstances or the interests of justice demand it.

Session Law 2008–133, § 1 (amending N.C. Gen. Stat. § 15A-1371(b) (1993)), available at https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2007-2008/SL2008-133.pdf [https://perma.cc/UH2B-FMG8]; (see also Stevens Aff. (DE 58-1) ¶¶ 10, 16). Accordingly, after 2008, plaintiff received parole reviews every three years.

As a precursor to parole, North Carolina prisoners are placed on the Mutual Agreement Parole Program ("MAPP agreement"). (Stevens Aff. (DE 58-1) ¶ 21). A MAPP agreement is an agreement between DPS, the Parole Commission, and the inmate that allows the inmate to progress through various custody levels and be placed on work release. (Id. ¶ 19). If the inmate complies with the MAPP agreement and DPS or the Parole Commission do not vote to terminate the agreement, the inmate will be placed parole. (Id. ¶¶ 20, 24). Placement on a MAPP agreement therefore does not guarantee parole. (See id. ¶¶ 20, 24).

In 2008, the Parole Commission referred plaintiff for a MAPP agreement, and DPS officials approved him for a 24-month agreement. (Id. ¶ 22). Shortly before expiration of the 2008 MAPP

---

[7]The version of § 15A-1371(b)(2) applicable to plaintiff was repealed in 1994 in connection with enactment of the Structured Sentencing Act, N.C. Gen. Stat. § 15A-1340.10 et seq., but remained effective for prisoners convicted of crimes that occurred prior to the Structured Sentencing Act. See Hunt v. Rand, No. 5:10-CT-3139-FL, 2011 WL 3664340, at *1 n.1 (E.D.N.C. Aug. 11, 2011), aff'd, 461 F. App'x 327 (4th Cir. 2012).

7

agreement, DPS officials referred plaintiff to the Parole Commission for a Commission vote regarding parole release. (Id. ¶ 24). The Parole Commission ordered a psychological evaluation before the final vote. (Id.). The psychologist determined that plaintiff presented a high risk of re-offense, and there was a significant probability plaintiff would resort to criminal activity to secure money. (Id.). A few days prior to plaintiff's anticipated parole release, the Parole Commission terminated the MAPP agreement, thereby effectively denying parole. (Id.).

As a result of the foregoing, plaintiff has not been approved for parole despite numerous reviews and placement on one MAPP agreement. (See id. ¶¶ 16-17, 21-24).

## DISCUSSION

A.  Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the

8

non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.  Analysis

Defendants raise the affirmative defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when 1) the plaintiff has not demonstrated a violation of a constitutional right,

9

or 2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009). The court may proceed directly to the clearly established prong without first resolving whether the plaintiff has established a constitutional violation. Id.

In determining whether the right at issue was clearly established, the court must define "the right allegedly violated ... at the appropriate level of specificity." Wilson v. Layne, 526 U.S. 603, 615 (1999). This does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established." Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362–63 (quotation omitted). The right allegedly abridged is "clearly established" for qualified immunity purposes if

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted).

1. Good-time credits

Plaintiff argues that because his concurrent life sentences are considered eighty-year terms under N.C. Gen. Stat. § 14-2 (1974), DPS should have credited his earned good time, gain time, and merit time sentence credits ("good-time credits") toward his unconditional release date. Plaintiff primarily alleges the DPS policy refusing to apply such credits toward his unconditional release date violates his rights under the Fourteenth Amendment's Due Process Clause, and the Ex Post Facto

Clause of the United States Constitution. Plaintiff seeks an order directing DPS officials to apply his earned good time credits towards his unconditional release date, resulting in his immediate or speedier release.

Plaintiff cannot obtain restoration of good time credits in a § 1983 civil rights action. "[W]hen a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." Preiser v. Rodriguez, 411 U.S. 475, 500 (1973). This rule applies to claims alleging wrongful denial of good-time credits. Id. at 487-89 ("So, even if restoration of respondents' good-time credits had merely shortened the length of their confinement, rather than required immediate discharge from that confinement, their suits would still have been within the core of habeas corpus in attacking the very duration of their physical confinement itself."); see also Todd v. Baskerville, 712 F.2d 70, 73 (4th Cir. 1983) (holding that where the plaintiff alleges "certain good-conduct credits were improperly canceled by the defendants" and seeks "restoration of those canceled credits so that he can secure his release" the claim must be brought as a habeas corpus action). Accordingly, plaintiff's sentence credit claim is not cognizable in this civil rights action.

But even assuming plaintiff could proceed in this action with a claim challenging wrongful denial of good-time credits, plaintiff's constitutional claims fail on the merits. The Fourth Circuit has expressly rejected (in a habeas action) plaintiff's claims that Jones was contrary to clearly-established federal law. Waddell v. Dep't of Corr., 680 F.3d 384, 395-96 (4th Cir. 2012). The Waddell petitioner brought claims identical to the ones alleged in plaintiff's amended complaint: that DPS's refusal to award him good-time credits toward his unconditional release date violated his

rights under the Fourteenth Amendment Due Process Clause, and the Ex Post Facto Clause. See id. at 390.

> As to the due process challenge, the Fourth Circuit held:
>
> Because [Waddell's] good time credits were never used for the purpose of achieving the relief Waddell seeks [credit toward his unconditional release date], his right to use such credits in that manner could not be abrogated. . . .
>
> Put simply, the DOC's practice of applying earned good time credits for certain identified purposes, but not for the purpose sought by Waddell [to provide credit toward his unconditional release date], does not give rise to a liberty interest protected by the Due Process Clause. See Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 465, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) (emphasizing that common practice of Board of Prisons was insufficient to create liberty interest where statute neither required nor prohibited such practice). In other words, as explained by North Carolina's highest court in the Jones decision, "[b]ecause [Waddell] has received the awards to which he is entitled for the purposes for which he is entitled, he has not been denied credits in which he has a constitutionally protected liberty interest." Jones, 698 S.E.2d at 56. As a result, Waddell's liberty interest in good time credits has been sufficiently recognized. His due process claim therefore fails.

Id. at 395 (some citations omitted).

> As to plaintiff's ex post facto challenge, the Fourth Circuit also rejected the claim:
>
> The ex post facto clause bars a retroactive enactment that increases the punishment for a crime after it has been committed. . . .
>
> As we have emphasized, however, the DOC has always treated life sentences and sentences for terms of years differently—regardless of whether a sentence was deemed an eighty-year term under § 14–2. . . .
>
> Waddell's ex post facto claim has no merit because, as the Jones decision explained, no legislative or regulatory enactment ever altered Waddell's award of good time credits. Put simply, Waddell's sentence has been—and remains—life in prison. His current projected release date was calculated pursuant to a short-lived enactment that deemed a "life sentence" to be eighty years. Such a release date calculation is the product of a legislative enactment and does not guarantee Waddell's release at any time before 2054. Although North Carolina law provided for the award of good time credits, it is for the DOC to determine how those credits are to be applied.

Id. at 396.

Accordingly, the Fourth Circuit has rejected plaintiff's constitutional claims related to defendants' refusal to award good-time credits toward his unconditional release date. Plaintiff therefore cannot establish a violation of his clearly-established constitutional rights as to this claim.

2. Parole Claims

While plaintiff's amended complaint is not a model of clarity, he also appears to be challenging the change to his parole review intervals under the Fourteenth Amendment and Ex Post Facto Clause.[8] (See Am. Compl. (DE 48) at 18, 24).[9] As noted, in 2008, the North Carolina General Assembly amended the parole statute to provide that offenders convicted of first and second-degree murder shall be reviewed for parole every three years instead of annually. Session Law 2008–133, § 1 (amending N.C. Gen. Stat. § 15A-1371(b) (1993) (repealed)); (see also Stevens Aff. (DE 58-1) ¶¶ 10, 16).[10] The Parole Commission, however, may provide more frequent review if it finds such review warranted by exigent circumstances or the interests of justice. Session Law 2008–133, § 1; (see also Stevens Aff. (DE 58-1) ¶¶ 10, 16).

The court begins with plaintiff's claims that defendants violated the Ex Post Facto Clause by expanding the interval between his parole reviews. The Ex Post Facto Clause prohibits legislative enactments that, "by retroactive operation, increase the punishment for a crime after its commission." Garner v. Jones, 529 U.S. 244, 249 (2000). Legislative enactments that amend the

---

[8]This claim is properly brought under § 1983 because plaintiff does not seek immediate or speedier release, but only more frequent parole reviews. See Wilkinson v. Dotson, 544 U.S. 74, 82 (2005).

[9]Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

[10]As set forth above, the full text of the session law is available at: https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2007-2008/SL2008-133.pdf [https://perma.cc/UH2B-FMG8].

laws governing parole eligibility and review and that apply to prisoners convicted prior to enactment may violate the Ex Post Facto Clause. Id. at 250; Lynce v. Mathis, 519 U.S. 433, 445-46 (1997). In cases where new legislation extends the time period between parole reviews and applies to prisoners convicted prior to enactment, the law violates the Ex Post Facto Clause if it creates "a sufficient risk of increasing the measure of punishment attached to the covered crimes." Garner, 528 U.S. at 250; California Dep't of Corr. v. Morales, 514 U.S. 499, 509 (1995).

In Morales, the Supreme Court considered whether a California statute that permitted the parole board to increase the interval between parole reviews violated the Ex Post Facto Clause. 514 U.S. at 507, 512-13. The Court held the statute did not violate the clause because it did not change the statutory punishments imposed for the relevant offenses, alter the standards for determining either the initial date for parole eligibility or suitability for parole, and also did not change the "basic structure" of the state's parole law. Id. at 507-08, 510-13; see also Garner, 529 U.S. at 250 (summarizing Morales's holding).

Garner also involved an ex post facto challenge to a state law granting the parole board discretion to increase the interval between parole reviews, and the Court ultimately concluded the record failed to establish the law created a sufficient risk of retroactively-increased punishment. Garner, 529 U.S. at 246, 253-56. In both Garner and Morales, the Court emphasized that the laws permitted the parole board to conduct earlier parole reviews based on a change in circumstances and vested broad discretion in the parole board to grant expedited hearings, thus negating the argument that the statute categorically increased punishment by increasing the interval between parole reviews. Garner, 529 U.S. at 254; Morales, 514 U.S. at 512-13.

Like the statutes at issue in Garner and Morales, N.C. Gen. Stat. § 15A-1371(b) (1993)

14

(repealed) does not change the punishment for plaintiff's underlying offense, alter the standards for establishing either the initial date for parole eligibility or suitability for parole, or otherwise change the basic structure of North Carolina's parole system.[11] Moreover, as in Garner and Morales, the statute permits the Parole Commission to grant expedited hearings based on exigent circumstances or if the interests of justice demand it. Id. Thus, the court concludes N.C. Gen. Stat § 15A-1371(b) does not on its face create a sufficient risk of retroactively-increased punishment. See Hunt, 2011 WL 3664340, at *3 (holding same), aff'd, 461 F. App'x 327 (4th Cir. 2012).

Additionally, to establish an ex post facto violation, plaintiff must demonstrate that "as applied to his own sentence the law created a significant risk of increasing his punishment." Garner, 529 U.S. at 255. Plaintiff has not made this showing. In light of plaintiff's numerous convictions for violent felonies (including first-degree murder conviction), and plaintiff's 2010 psychological evaluation suggesting he remains at high risk for re-offense, the increased interval for his parole review likely would not significantly increase his risk for serving a longer term of incarceration. More importantly, plaintiff is free to apply for expedited consideration under the parole statute if he believes changed circumstances or the "interests of justice" demand expedited review. See Garner, 529 U.S. at 255 ("Given respondent's criminal history, including his escape from prison and the commission of a second murder, it is difficult to see how the Board increased the risk of his serving a longer time when it decided that its parole review should be exercised after an 8-year, not a 3-year, interval. Yet if such a risk develops, respondent may, upon a showing of either 'a change in [his] circumstance[s]' or the Board's receipt of 'new information,' seek an earlier review before the

---

[11]N.C. Gen. Stat. § 15A-1371(b) does not change the "basic structure" of North Carolina's parole system because the law expressly grants the Parole Commission discretion to conduct expedited reviews for offenders convicted of first or second-degree murder, and thus such offenders are not categorically prohibited from receiving parole reviews when circumstances suggest they are eligible for parole.

8–year interval runs its course."). Thus, on this record, plaintiff cannot establish that the increased interval between his parole reviews will create a significant risk of increased punishment.

Plaintiff also appears to argue that the change in parole review frequency violated his due process rights under the Fourteenth Amendment. The Due Process Clause analysis involves two steps: "[the court first determines] whether there exists a liberty or property interest of which a person has been deprived, and if so [the court analyzes] whether the procedures followed by the State were constitutionally sufficient." Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (citation omitted). An inmate has no independent federal constitutional right to be paroled before the expiration of his valid criminal sentence, and states have no constitutional obligation to establish a parole system. See id. at 220. However, when a state does create a liberty interest, such as by requiring that certain prisoners receive parole consideration,[12] the Due Process Clause "requires fair procedures for its vindication – and federal courts will review the application of those constitutionally required procedures." Id.; Burnette, 687 F.3d at 180-82. The procedural requirements are minimal in the context of parole, and due process simply requires, at most, that an inmate be provided a statement of the reasons why parole was denied. Id.; Vann v. Angelone, 73 F.3d 519, 522 (4th Cir.1996).

Here, the Due Process Clause is not implicated by the change in plaintiff's parole review intervals. Rather, due process merely requires that the Parole Commission conduct plaintiff's parole reviews at the intervals dictated by North Carolina law, and provide plaintiff with a statement of the

---

[12]In such circumstances, the state-created liberty interest is in parole consideration, not release on parole. Burnette v. Fahey, 687 F.3d 171, 181 (4th Cir. 2012).

reasons parole was denied.[13] Vann, 73 F.3d at 522; see also Ewell v. Murray, 11 F.3d 482, 488 (4th Cir. 1993) ("The procedures may be changed at the will of prison officials so long as they afford that process which is due under the Due Process Clause of the Fourteenth Amendment."). As set forth above, plaintiff has received regular parole reviews since he became eligible for parole, and he admits that he received denial letters explaining the reason(s) parole was denied. (See Pl.'s Resp. (DE 70) at 13). Accordingly, plaintiff has not established a constitutional violation with respect to the changed frequency of his parole reviews.

3.  New Claims

Plaintiff also alleges various new claims for relief in his response to defendants' motion for summary judgment, including that he is entitled to additional parole reviews pursuant to N.C. Gen. Stat. § 143B-721.1. These claims were not alleged in the operative amended complaint, and plaintiff cannot amend his complaint by alleging new claims in his response to a motion for summary judgment. See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) ("[D]espite the liberal pleading rules outlined by the Supreme Court, plaintiffs may not raise new claims without amending their complaints after discovery has begun."); see also Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). Accordingly, the court dismisses these claims without prejudice.

---

[13]To the extent plaintiff is alleging defendants (or the North Carolina General Assembly) must provide notice or an opportunity to be heard before changing the intervals between his parole reviews, plaintiff has not provided any case law (and the court is aware of none) suggesting the Due Process Clause requires such procedure. Accordingly, assuming without deciding this change in law violated plaintiff's Fourteenth Amendment rights, the constitutional right was not clearly established at the time of the alleged violation. See Wilson, 526 U.S. at 615 (discussing clearly-established prong of qualified immunity analysis). Additionally, the named defendants are not the state legislators who changed the intervals in which plaintiff is reviewed for parole. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (holding that to state a claim under § 1983, plaintiff "must plead that each Government-official defendant, through the official's own individual actions, as violated the constitution.").

**CONCLUSION**

Based on the foregoing, the court DENIES plaintiff's motion for partial summary judgment (DE 41), GRANTS defendants' motion for summary judgment (DE 63), and dismisses the claims alleged in plaintiff's amended complaint with prejudice. The court dismisses any new claims alleged in plaintiff's response to defendants' motion for summary judgment without prejudice. The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of March, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge